# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.:12-23466-CIV-SEITZ/TURNOFF

JMA, INC., et al.,

      Plaintiffs,

v.

BIOTRONIK, INC.,

      Defendant.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Biotronik, Inc.'s Motion for Summary

Judgment [DE-116] and Plaintiffs/Counter-Defendants' Motion for Summary Judgment as to

Biotronik's Counterclaims [DE-123]. This case arises from a failed contractual business

relationship between Plaintiffs JMA, Inc., J.A. LaPadula, Inc., Joseph LaPadula, and Scott

Mathison (jointly, the Representatives) and Defendant. The Representatives were sales

representatives for Defendant until the relationship fell apart, leading to a race to the courthouse.

Plaintiffs won the race and now have a four-count Second Amended Complaint [DE-87].

Defendants filed a counterclaim [DE-92].

Plaintiffs' Second Amended Complaint alleges that Defendant breached the parties'

agreements by participating in Biotronik GmbH's original equipment manufacturer (OEM)

program, by wrongfully removing certain accounts from the Representatives' territory, by

breaching the agreements' implied covenant of good faith and fair dealing, and by interfering

with the Representatives' right or ability to perform under the agreements. Plaintiffs' declaratory

relief claims seek declarations that: (1) the agreements were terminable at will and, as a result,

LaPadula and Mathison did not breach the agreements and Plaintiff St. Jude Medical S.C., Inc. (SJM) did not tortiously interfere; (2) that Defendant terminated the agreements and thereby vitiated the need for LaPadula and Mathison to terminate prior to being hired by SJM and preventing SJM from tortiously interfering; and (3) the Representatives were entitled to terminate the agreements based on Defendant's breach of the agreements and, thus, the Representatives were not bound by any post-termination covenants and SJM could not have tortiously interfered.

Count I of Defendant's counterclaim alleges that the Representatives breached the agreements by violating their non-compete and non-solicitation obligations and the implied covenant of good faith and fair dealing.  Count II alleges that SJM tortiously interfered with the contractual relationships between Defendant and the Representatives by inducing the Representatives not to perform their obligations under the agreements.  Count III alleges that Plaintiffs have been unjustly enriched as a result of the Representatives' breach of the agreements.

Plaintiffs' motion for summary judgment seeks summary judgment on all three counts of Defendant's counterclaims.  Defendant's motion seeks summary judgment on all of Plaintiffs' claims.  Because genuine issues of material facts remain as to several issues, the motions are each granted in part and denied in part.  Plaintiffs' motion is granted as to Count III of Defendant's Counterclaim for unjust enrichment because the Agreements are express contracts that address the same subject matter.   Plaintiffs' motion is denied in all other respects. Defendant's motion is granted as to Count I of the Second Amended Complaint for breach of contract to the extent the breach is based on the OEM program, granted as to Count II of the Second Amended Complaint because the agreements were not terminable at-will, and denied in

2

all other respects.

## I. Undisputed Material Facts

### *The Parties' Agreements*

Effective April 1, 2006, Plaintiffs Joseph A. LaPadula (LaPadula) and J.A. LaPadula, Inc. (JAL) entered into an Independent Representative Agreement (the 2006 Agreement) with Defendant Biotronik, Inc. (Biotronik) to act as independent sales representatives of Biotronik's cardiac rhythm management (CRM) devices.  (DE-126-1.)  In that agreement, LaPadula and JAL agreed to work as independent contractor sales representatives for Biotronik from April 1, 2006 until March 31, 2015 in a certain territory in south Florida.  Three years later, effective August 1, 2009, Plaintiffs LaPadula, Scott D. Mathison (Mathison), and JMA, Inc. entered into an Independent Representative Agreement with Biotronik (the 2009 Agreement) to act as independent sales representatives for Biotronik's CRM devices.  (DE-126-2.)  In the 2009 Agreement, LaPadula, Mathison, and JMA agreed to work as authorized sales representatives for Biotronik from August 1, 2009 until March 31, 2015.  In both agreements (jointly, the Agreements), Biotronik is defined as Biotronik, Inc., an Oregon Corporation.  The Agreements state that they are governed by Oregon law.

The provisions of the Agreements that are relevant to this suit are those that address the term of the Agreements, termination of the Agreements, account deletion by Defendant, the definition of the products the Representatives can sell, the Representatives' post-termination obligations, and the so-called duty of loyalty.  These provisions are set out below.  However, because the Agreements contain virtually identical language, the relevant provisions are only set out once and any variation is noted in a footnote.

3

Paragraph 1, which addresses the term of the Agreements, states:

1][1]     Term.

  a]     The term of this Agreement shall begin on the 1st day of April, 2006 and shall end on the 31st day of March, 2015, [10 years] unless terminated earlier as provided herein.

  b]     After the scheduled termination date set forth in the preceding subparagraph a], this Agreement shalt be automatically extended for successive one-year periods unless otherwise terminated as provided in this Agreement.

  c]     Either party may give written notice of its intent to terminate at least ninety [90] days prior to the end of the initial term of ten [10] years or the end of any one-year extension of that initial term.

(DE-126-1.)[2]

Paragraph 38 of the Agreements addresses termination:

38]     Termination.

  a]     Either Biotronik or the Representative may terminate this Agreement, without cause, upon delivering written notice to the other party not less than ninety [90] calendar days prior to the last day of the original or any successive term of this Agreement.

  b]     Biotronik at any time may terminate the Representative's rights under this Agreement for any of the following causes or upon any of the following events:

    b.1]     Failure to meet established sales quotas.  Quotas must be maintained on a quarterly basis. Failure to achieve the cumulative

---

[1]While the Agreements use brackets after the number or letter of a sub-section, for ease of reading the Court will use full parenthesis to set out section and sub-section numbers and letters, for example, 1]a] will be set out in text as 1(a).  When directly quoting a section of the Agreements, the Court will use the nomenclature used in the Agreement.

[2]The difference between this language and the language in the other agreement is the dates of the term and the length of the term.  Otherwise, the language of the two agreements is the same.

quota during any given quarter allows Biotronik the right to modify or terminate this Agreement.  Failure to achieve annual quotas gives Biotronik the right to automatically terminate this Agreement;

b.2]    A breach of the Representative directly, or through its employees, salespersons, agents or associate representatives of any of the terms or conditions set forth in this Agreement;

b.3]    Upon discovery by Biotronik that the Representative has made any misrepresentation to Biotronik in connection with the execution of this Agreement;

b.4]    The Representative, any of its owners or shareholders, or any of its officers or directors, becomes insolvent or bankrupt. or a petition be made to have any of them declared insolvent or bankrupt, or a receiver or trustee be appointed, or any of them making an assignment for the benefit of creditors;

b.5]    The Representative's financial, health or other condition or circumstance in the sole judgment of Biotronik, be such as to endanger the ability of the Representative to perform its functions hereunder;

b.6]    The Representative shall at any time conduct itself or its business in such a manner as, in the sole judgment of Biotronik, might adversely affect the name, reputation or goodwill of Biotronik; and

b.7]    The Representative shall fail to engage in reasonable promotion of Products.

(DE-126-1 & DE-126-2.)

Biotronik had the right to take back any accounts in a Representative's territory if sales fell below $100,000 in any year.  (DE-126-1 at ¶5(c).)  Specifically, the Agreements state:

Biotronik retains the right to take back any hospital accounts or individual physician accounts in the Representative's Territory in which Representative has failed to sell the greater of twenty percent (20%) of the previous years [sic] cardiac rhythm product sales at such accounts or $100,000 in total revenue in any given fiscal year (January - December).

(*Id.*)

5

The Agreement set out and defined what products the Representatives could sell.  Under the terms of the Agreements, the Representatives were engaged to "promote, sell, distribute and service Products."  (DE-126-1 at ¶2(a).)  The Agreements define the term "Products" as:

> those cardiac pacing products, processes and services which are manufactured, distributed, promoted, marketed or sold by Biotronik after such Products have been tested, approved and released by Biotronik's Quality Assurance Department even though any such same Product may be available directly to the Representative through some other source.

(DE-126-1 at 34.)

The Agreements also contained what Biotronik refers to as a duty of loyalty clause, which states:

> During the term of this Agreement . . . the Representative shall not, directly or indirectly, assist or render services to or for any individual or entity engaged in or about to become engaged in the development, production, marketing, or sale of any product, good or service.

(DE-126 at ¶10.)

Finally, the Agreements contain a covenant not to compete provision that is effective for a period of one-year after termination of the Agreements.  This provision prohibits the Representatives from contacting or soliciting any client, customer, or physician within the territory who the Representative had contact with within the last year on behalf of Biotronik. (DE-126-1 at ¶11.)

*The OEM Program*

In November 2006, Biotronik's German sister entity, Biotronik GmbH n/k/a Biotronik SE (Biotronik-Germany) entered into a original equipment manufacturer (OEM) agreement with a competitor in the CRM business, Boston Scientific Corp.  In the agreement with Boston

Scientific, Biotronik-Germany agreed to supply Boston Scientific, for resale in the United States, with CRM leads. These leads were identical, except in name, to the CRM leads that Biotronik acquired from Biotronik-Germany and sold in the United States through sales representatives, including LaPadula and Mathison.  In March of 2011, Biotronik-Germany entered into a similar OEM agreement with another CRM competitor, ELA/Sorin.  Biotronik is the FDA regulatory agent for Biotronik-Germany and, as such, obtains FDA approval for all of Biotronik-Germany's CRM products.  Thus, Biotronik obtained FDA approval for Biotronik-Germany's CRM products manufactured for the OEM agreements with Boston Scientific and ELA/Sorin. Biotronik is not a party to either of the OEM agreements.  As with the CRM products supplied to Boston Scientific, the CRM products supplied to ELA/Sorin under the OEM agreements were identical, except in trade name, to CRM products that the Representatives offered for sale under the Agreements.

*Termination of the Agreements*

On May 25, 2011, Biotronik sent LaPadula, Mathison, and JMA a letter stating that it was formal notification of the deletion of certain accounts from their territory, pursuant to paragraph 5(c) of the Agreements.  (DE-119-3.)   Thereafter, in mid-2012, the Representatives retained counsel because they were unhappy with their employment situation with Biotronik.  (DE-119-12 at 66:22-25.[3])  The Representatives' counsel began negotiating for the sale of the Representatives' business to a Biotronik competitor in the CRM business, Plaintiff SJM.  (DE-

---

[3]DE-119-12 is excerpts of LaPadula's deposition.  The pages cited refer to the actual transcript page numbers, not the CM/ECF page numbers.

119-9; DE-119-13 at 72:16-23, 73:20-74:3.[4])  On September 18, 2012, LaPadula informed Steve

Diaz and Edwin Hernandez, sub-representatives of the Representatives, that the Representatives

had come to an agreement in principle with SJM for the Representatives to go to work for SJM.

(DE-119-17 & DE-119-18.)  On the same day, LaPadula told Diaz and Hernandez that LaPadula

and Mathison would be signing contracts with SJM on September 25, 2012.  (DE-119-17 & DE-

119-18.)

On September 21, 2012, Defendant sent LaPadula and JAL a letter terminating the 2006

Agreement.  (DE-126-5.)  On the same date, Defendant sent LaPadula, Mathison, and JMA a

letter terminating the 2009 Agreement.  (DE-126-6.)  The language of the two termination letters

is essentially the same.  Quoting paragraph 38(b)(2),[5] (5), and (6) of the Agreements, the letters

state that Biotronik is terminating the Agreements because of the Representatives' "decision to

work for SJM and to encourage your sub-representatives to do so in breach of the Agreement."

Plaintiffs filed their complaint on September 24, 2012.  Thereafter, in October 2012, SJM hired

LaPadula and Mathison pursuant to employment agreements they had signed on September 26,

2012 and SJM had countersigned on October 8, 2012.

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc.*

---

[4]DE-119-13 is excerpts of Mathison's deposition.  The pages cited refer to the actual transcript page numbers, not the CM/ECF page numbers

[5]While the letters state that they are quoting paragraph 38(b)(1), the language quoted is actually from paragraph 38(b)(2).

*v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Discussion[6]

  A. *The Agreements Were Not Terminable At Will and, Therefore, Defendant is Entitled to Summary Judgment on Count II of the Second Amended Complaint*

  Plaintiffs argue that all of Defendant's claims fail because they are premised on the belief that the Agreements were not terminable at-will, when, in fact, they were terminable at-will. Thus, Plaintiffs maintain that the Representatives did not breach the Agreements because they were terminable at-will and that SJM could not tortiously interfere with a contract that was terminable at-will. Defendant asserts that the Agreements were not terminable at-will but only for cause. Because the Agreements were not terminable at-will, Plaintiffs are not entitled to summary judgment on Biotronik's counterclaims based on Plaintiffs' at-will theory and Biotronik is entitled to summary judgment on Count II of Plaintiffs' Second Amended Complaint.

  The relevant provisions of the Agreements are paragraphs 1 and 38. Paragraph 1 states:

1]  Term.
   a]  The term of this Agreement . . . shall end on the 31ˢᵗ day of March, 2015, . . . unless terminated earlier as provided herein.

   b]  After the scheduled termination date set forth in the preceding subparagraph a], this Agreement shalt be automatically extended for successive one-year periods unless otherwise terminated as provided in this Agreement.

   c]  Either party may give written notice of its intent to terminate at least ninety [90] days prior to the end of the initial term of . . . years or the end

---

  [6]The parties have organized their moving papers by overriding legal issues, instead of the more common organization by count. As a result, the Court's discussion also follows the by-issue organization. Based on this organizational structure, it appears that the parties have not given thought to what they must prove as to each of the individual counts when this case goes to trial. Consequently, the Court urges the parties to start rethinking the organization of their cases and will require the parties to do so when they file their joint Pretrial Stipulation.

of any one-year extension of that initial term.

Paragraph 38, in relevant part, states:

a]   Either Biotronik or the Representative may terminate this Agreement, without cause, upon delivering written notice to the other party not less than ninety [90] calendar days prior to the last day of the original or any successive term of this Agreement.

b]   Biotronik at any time may terminate the Representative's rights under this Agreement for any of the following causes . . .

Defendant asserts that when these clauses are read together, they establish that the Agreements are for a term of years and may only be terminated for cause or at the end of the initial term or any successive term. Plaintiffs maintain that when read together these provisions permit any party to terminate without cause with timely written notice.

Oregon Statute[7] sets out the Court's role in interpreting the Agreements:

In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all.

O.R.S. § 42.230. Thus, the Court must interpret the Agreements by looking at the actual language used by the parties in the Agreements. Moreover, a contract should not be interpreted to render any part of it meaningless. *Oregon Bank v. Nautilus Crane & Equipment Corp.*, 683 P.2d 95, 105 (Or. App. 1984). Reading the Agreements as a whole requires the conclusion that they were not terminable at-will.

Paragraph 1(a) specifically states that the Agreement ends March 31, 2015 unless terminated as provided in the Agreement. The Agreement then provides three ways to terminate

---

[7]As noted earlier, the Agreements state that they are governed by Oregon law.

11

in paragraphs 1(c), 38(a), and 38(b).  Paragraph 1(c), when read in context with the rest of paragraph 1, sets out the means for terminating the Agreement to avoid the automatic renewal, which is set out in paragraph 1(b).  Paragraph 38 sets out the two remaining means for terminating the Agreement.  Paragraph 38(b) permits Biotronik to terminate at any time for certain enumerated causes.  The parties' dispute lies in the interpretation of paragraph 38(a).

Plaintiffs argue that paragraph 38(a) allows any party to terminate without cause upon timely written notice.  However, if that is the meaning of paragraph 38(a), then paragraph 38(b) would be entirely superfluous.  If the Agreements were terminable at-will then there would be no need for paragraph 38(b), which sets out when Biotronik can terminate the Agreements for cause prior to the end of the term.  Cause would be irrelevant because either side could always terminate at-will.  Thus, if the Agreements are interpreted as Plaintiffs urge, all of paragraph 38(b) would be meaningless, in violation of one of the canons of contract interpretation.  Defendant argues that paragraphs 1(c) and 38(a) serve essentially the same purpose; they set forth the means by which either party may prevent the term from renewing under paragraph 1(b).  Only by reading paragraphs 1(c) and 38(a) as the means for preventing renewal of a term can all of the provisions of the Agreements be given meaning.  Thus, the Agreements were for a term of years, terminable either upon timely notice prior to renewal of the term, as set out in paragraphs 1(c) and 38(a), or for cause, as set out in paragraph 38(b).

Because the Agreements were not terminable at-will, Plaintiffs are not entitled to summary judgment on Count I of the counterclaim for breach of contract and Count II of the counterclaim for tortious interference.  For the same reason, Defendant is entitled to summary judgment on Count II of the Second Amended Complaint, which seeks a declaration that the

Agreements are terminable at-will.

> B.   *Plaintiffs Are Entitled to Summary Judgment on Biotronik's Claim for Unjust Enrichment, Count III of the Counterclaim*

Plaintiffs move for summary judgment on Count III of Biotronik's counterclaim for unjust enrichment. Plaintiffs assert that both Oregon and Florida law prohibit recovery for unjust enrichment when an enforceable contract exists between the parties. Biotronik has not responded to this argument. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.* 43 F.3d 587, 599 (11th Cir. 1995). Thus, it appears Defendant has abandoned its unjust enrichment claim. Moreover, unjust enrichment cannot apply where an express contract exists concerning the same subject matter. *Atlantis Estate Acquisitions, Inc. v. DePierro*, 125 So. 3d 889, 893-94 (Fla. 4th DCA 2013). Because the Agreements concern the same subject matter as Defendant's unjust enrichment claim, the unjust enrichment claim cannot stand. Consequently, Plaintiffs are entitled to summary judgment on Defendant's claim for unjust enrichment, Count III of the counterclaim.

> C.   *Plaintiffs Did Not Breach their Contractual Duty of Loyalty Prior to September 21, 2012*

Biotronik maintains that the Representatives breached the Agreements' duty of loyalty provision simply because they negotiated with SJM and, thus, Biotronik is entitled to summary judgment on Counts III and IV of the Second Amended Complaint. However, contrary to Biotronik's assertions, the Representatives' actions prior to the September 24, 2012 termination letter did not breach the Agreements' duty of loyalty provisions. As set out above, the duty of loyalty is defined in the Agreements as:

> During the term of this Agreement . . . the Representative shall not, directly or indirectly,

assist or render services to or for any individual or entity engaged in or about to become engaged in the development, production, marketing, or sale of any product, good or service.

The Representatives' negotiations with SJM and even their alleged decision to sell the business to SJM and go to work for SJM do not violate the terms of this clause of the Agreements. Neither the negotiations nor the decision amount to "assisting or rendering services" to SJM. While the Representatives' actions may have violated the spirit of the provision, their actions did not violate the letter of the provision.[8]  Thus, the Representatives did not violate this provision of the Agreements prior to the September 21, 2012 termination of the Representatives by Biotronik. Consequently, Biotronik is not entitled to summary judgment on Counts III and IV of the Second Amended Complaint based on the Representatives' alleged breach of the duty of loyalty. Further, to the extent that Count I of Biotronik's counterclaim is based on the breach of the duty of loyalty, it is dismissed.

> D.   *A Material Issue of Fact Exists as to Whether Biotronik's Termination of the Agreements Was Proper*

Plaintiffs maintain that Biotronik's termination of the Agreements was improper because it was not based on an actual violation of the duty of loyalty.  To the extent that the termination was based on the alleged breach of the duty of loyalty provision, it was improper because, as set out above, the Representatives had not violated the duty of loyalty as of September 21, 2012. However, the termination letters state that the terminations are also based on violations of paragraphs 38(b)(5) and (6), which state:

---

[8]While the parties dispute whether the Representatives knew about the negotiations, their knowledge is irrelevant because until they actually assisted or rendered services to SJM, directly or indirectly, they could not violate the duty of loyalty provision.

b.5]   The Representative's . . . condition or circumstance in the sole judgment of Biotronik, be such as to endanger the ability of the Representative to perform its functions hereunder;

b.6]   The Representative shall at any time conduct itself or its business in such a manner as, in the sole judgment of Biotronik, might adversely affect the name, reputation or goodwill of Biotronik[.]

Neither side has directly addressed whether Biotronik's termination of the Agreements was proper under these provisions of the Agreements.  These provisions do not require an actual breach of a specific Agreement provision by the Representatives prior to termination.  Moreover, these provisions leave to Defendant's "sole judgment" the determination of whether the Representatives' circumstances or conduct warrant termination.  If the terminations were proper under these provisions, the Representatives would be obligated to comply with paragraph 11 of the Agreements, which sets out a one-year period of non-competition after termination.  However, because the parties' motions did not discuss these two grounds for termination, summary judgment cannot be granted to Defendants on Count III of Plaintiffs' Second Amended Complaint, which seeks a declaration that Biotronik's improper termination of the Agreements vitiated any need for LaPadula and Mathison to terminate the Agreements before becoming employed by SJM.

Defendant also seeks summary judgment as to Count IV of the Second Amended Complaint, which seeks a declaration that the Representatives' post-termination obligations are excused due to Defendant's material breaches of the Agreements.  In other words, if Biotronik did not breach the Agreements, the Representatives would still be bound by the post-termination provisions of the Agreements.  Defendant argues that it is entitled to summary judgment on Count IV because the termination was proper (and, thus, the Representatives are still bound by

the Agreements' post-termination provisions).[9]   Thus, because the parties have not addressed the two remaining contractual grounds for termination, the Court assumes both sides recognize a material issue of fact remains as to whether the terminations were proper.  Therefore, summary judgment cannot be granted as to Count IV of the Second Amended Complaint.

> E.     *Defendant's OEM Program Did Not Violate the Agreements and, thus, Does Not Excuse the Representatives' Post-Termination Performance*

The OEM program is one of the bases for Plaintiffs' breach of contract claim in Count I and one of the bases for the declaratory relief sought in Count IV of the Second Amended Complaint.  Plaintiffs maintain that Biotronik's OEM program impinged on the contractual rights of the Representatives and, thus, materially breached the Agreements.  As a result of this alleged material breach, the Plaintiffs argue that the Representatives were excused from performance under the Agreements and SJM could not tortiously interfere with the Agreements.  Biotronik responds by pointing out that the OEM program involved sales of CRM devices by Biotronik-Germany, a separate company, and that the Representatives were never authorized to sell OEM products.  Thus, because Biotronik did not partake in the OEM program[10] and the Representatives were not authorized to sell OEM products, Biotronik did not breach the Agreements.

---

[9] Count IV is also based on Defendant's alleged breach of the Agreements by instituting the OEM program.  However, as set forth below, the OEM program was not a breach of the Agreements by Biotronik.

[10] While an argument can be made that Biotronik partook in the OEM program by obtaining the necessary FDA approvals for the OEM products, such a determination is irrelevant to the outcome.  Because, as set forth below, the Representatives did not have exclusive rights to the Products, the OEM program did not breach the Agreements, regardless of whether Biotronik was involved in the OEM program.

While Plaintiffs allege that Biotronik breached the Agreements, Plaintiffs have not pointed to a single express provision of the Agreements that the OEM program breached. Nor have Plaintiffs pointed to an exclusivity provision in either Agreement. The only express provision actually cited by Plaintiffs is the provision defining "products." Under that provision and paragraph 2 of the Agreements, the Representatives may only sell:

> those cardiac pacing products, processes and services which are manufactured, distributed, promoted, marketed or sold by Biotronik after such Products have been tested, approved and released by Biotronik's Quality Assurance Department even though any such same Product may be available directly to the Representative through some other source.

Thus, by its very terms, this provision recognizes that the same products that the Representatives are authorized to sell may be available through some other source too.

Another basis for Plaintiffs' breach of contract claim is the implied duty of good faith and fair dealing. Under Oregon law:

> the implied duty of good faith and fair dealing . . . cannot expand the parties' substantive duties under a contract; rather, it relates to the performance of the contract. *See Zygar v. Johnson*, 169 Or. App. 638, 646, 10 P.3d 326 (2000), *rev. den.*, 331 Or. 584, 19 P.3d 356 (2001) (a party's duty of good faith in the performance of a contract cannot contradict an express contractual term nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract). Thus, the duty of good faith and fair dealing—which serves to effectuate the objectively reasonable expectations of the parties—may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue; indeed, the reasonable expectations of the parties are irrelevant if the parties have agreed to an express term governing the issue. *Tolbert v. First National Bank*, 312 Or. 485, 492, 823 P.2d 965 (1991); *OUS v. OPEU*, 185 Or. App. 506, 511, 60 P.3d 567 (2002).

*Gibson v. Douglas County*, 106 P.3d 151, 158 (Or. App. 2005). Plaintiffs argue that Biotronik violated the implied duty of good faith and fair dealing by facilitating the OEM program that inured to the benefit of competing CRM companies, thereby impinging on the Representatives'

contractual rights.  However, even assuming that Biotronik's involvement in obtaining FDA approval for the OEM program products constituted direct involvement in the OEM program by Biotronik, Plaintiffs have not established how Biotronik violated the implied duty of good faith and fair dealing.  The Agreements did not contain exclusivity provisions and, in fact, recognized that the products that the Representatives were authorized to sell might be available through sources other than Biotronik.  Thus, express terms of the Agreements govern the issues raised by Plaintiffs.  Plaintiffs appear to be attempting to expand the express terms of the Agreement to include an exclusivity provision.  However, they cannot do so using the duty of good faith and fair dealing.  Because Plaintiffs have not established that Biotronik materially breached the Agreements, and thereby, excused the Representatives' performance under the Agreements, Plaintiffs are not entitled to summary judgment on Counts I and II of the Counterclaim.

> F.    *A Material Issue of Fact Exists as to Whether Defendant's Deletion of Accounts Was Proper*

The final basis for Plaintiffs' breach of contract claim is the deletion of accounts.  While Defendant's motion for summary judgment on Count I of Plaintiffs' Second Amended Complaint must be granted to the extent the breach of contract claim rests on Biotronik's involvement in the OEM program, the motion must be denied to the extent the breach of contract claim rests on Biotronik's deletion of some of the Representatives' accounts.

Plaintiffs' Second Amended Complaint alleges that Defendant breached the Agreements by deleting certain accounts assigned to the Representatives.  Defendant asserts that under the Agreements:

> Biotronik retains the right to take back any hospital accounts or individual physician accounts in the Representative's Territory in which Representative has failed to sell the

greater of twenty percent (20%) of the previous years [sic] cardiac rhythm product sales at
such accounts or $100,000 in total revenue in any given fiscal year (January - December).

According to Defendant, the deleted accounts all had less than $100,000 in sales. Plaintiffs

respond by arguing that Defendant has not presented sufficient evidence to establish that the sales

in the deleted accounts fell below the $100,000 level, thereby giving Biotronik the right to delete

the accounts. The only evidence Defendant presents to support the legitimacy of the accounts

deletion is the testimony of Mr. McColloch. Defendant has not explained who he is, if he has

personal knowledge of the sales made by the Representatives and why the accounts were deleted,

and, most importantly, the testimony does not clearly state that the accounts were deleted because

sales fell below the $100,000 mark. Inexplicably, neither side has submitted any actual sales

records relating to the deleted accounts. Consequently, summary judgment is denied as to Count

I of the Second Amended Complaint to the extent it is based on deletion of certain accounts.

> G.    *A Material Issue of Fact Exists Regarding Whether Biotronik Has Suffered*
>        *Damages*

Plaintiffs also move for summary judgment on Counts I and II of the counterclaim

because they assert that Biotronik has no proof of damages. Proof of damages is an essential

element of tortious interference, *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free,*

*Inc.*, 987 So. 2d 706, 707 (Fla. 4th DCA 2008), and breach of contract, *Moini v. Hewes,* 763 P.2d

414, 417 (Or. App. 1988). Biotronik has pled damages and seeks lost profits, based on past

profits for the years remaining on the Agreements term, which ends in 2015. Plaintiffs seem to

be challenging Biotronik's evidence to support the losses. Biotronik has, however, submitted

evidence of past profits.[11]  *See* DE-147-5; DE-147-8.  Under Oregon law, which governs the

breach of contract claim, when a plaintiff asserts a claim for damages for future harm, the

question of whether those damages are recoverable is a question of fact for the jury.  *City of*

*Eugene v. Monaco*, 17 P.3d 544, 548 (Or. App. 2000).  Further, future lost profits may be

established by proof of past profits of an established business.  *Id.*  Similarly, under Florida law,

which governs the tortious interference claim, lost profits for an established business can be

based on the "before and after theory."  *River Bridge Corp. v. American Somax Ventures ex rel.*

*American Home Development Corp.*, 18 So. 3d 648, 650 (Fla. 4th DCA 2009).  Because

Biotronik has provided its lost profits calculation based on past profits, a material issue of fact

exists as to whether Biotronik has suffered provable damages.  Therefore, Plaintiffs' Motion for

Summary Judgment on Counts I and II of the counterclaim is denied.

## IV.  Conclusion

Plaintiffs' Motion for Summary Judgment is denied as to Counts I and II of the

Counterclaim.  However, to the extent Count I of the counterclaim, for breach of contract, is

based on the Representatives' alleged breach of the duty of loyalty it is dismissed.  Plaintiffs'

Motion for summary judgment is granted as to Count III of the Counterclaim.  Thus, Count III for

unjust enrichment is dismissed.

Defendant's Motion for Summary Judgement is granted in part and denied in part as to

Count I of the Second Amended Complaint for breach of contract.  The motion is granted to the

---

[11]Plaintiffs have moved to strike some of the evidence submitted by Biotronik, specifically, a one-page summary of damages.  By separate order, the Court has denied the motion to strike.  However, in order to actually present the lost profits damages evidence to a jury, Biotronik will need to establish that all documentation relating to lost profits damages was timely produced to Plaintiffs.

extent the breach of contract claim is based on the OEM program. Thus, the only remaining basis for Plaintiffs' breach of contract claim, Count I of the Second Amended Complaint, is Defendant's deletion of certain sales accounts from the Representatives' territory. Defendant's Motion for Summary Judgment is also granted as to Count II of the Second Amended Complaint because the Agreements were for a term of years; they were not terminable at-will. Defendant's Motion for Summary Judgement as to Counts III and IV of the Second Amended Complaint is denied. Consequently, the following claims remain to be tried:

1. Plaintiffs' claim for breach of contract based on Defendant's deletion of certain sales accounts;

2. Plaintiffs' declaratory judgment claim seeking a declaration that Defendant's termination of the agreements, based on paragraphs 38(b)(5) and(6), vitiated the need for LaPadula and Mathison to terminate prior to being hired by SJM and preventing SJM from tortiously interfering;

3. Plaintiffs' declaratory judgment claim seeking a declaration that: (1) the Representatives were entitled to terminate the Agreements based on Defendant's breach of the Agreements by improperly deleting accounts; (2) the Representatives are not bound by the post-termination covenants; and (3) SJM could not have tortiously interfered;

4. Defendant's claim that the Representatives breached the Agreement by violating the non-compete and non-solicitation provisions and the implied covenant of good faith and fair dealing to the extent it is not based on an alleged breach of the duty of loyalty; and

21

5.       Defendant's claim of tortious interference against SJM.

The parties' joint Pretrial Stipulation is due **October 14, 2014.**  In addition to the other

requirements of the Pretrial Stipulation, which are set out in a simultaneously issued order, the

Pretrial Stipulation will need to propose a standard for the jury to use to evaluate whether

Defendant's terminations under paragraphs 38(b)(5) and (6) were proper given the for-cause

termination provisions which leave the decision to Defendant's "sole judgment."  The joint

Pretrial Stipulation must also include the relevant facts in dispute regarding the termination and

the exercise of Biotronik's judgment.  The Pretrial Stipulation must also clarify the factual basis

for Defendant's claim that the Representatives violated the implied covenant of good faith and

fair dealing.  Additionally, the Pretrial Stipulation should clearly set out which issues will be

tried by a jury and which will be tried by the Court.

Accordingly, it is hereby

ORDERED THAT:

1) Plaintiffs/Counter-Defendants' Motion for Summary Judgment as to Biotronik's

Counterclaims [DE-123] is GRANTED in part and DENIED in part:

> a) Plaintiffs' Motion for Summary Judgment is DENIED as to Counts I and II of
>
> the Counterclaim.
>
> b)  Plaintiffs' Motion for Summary Judgment as to Count III of the Counterclaim
>
> is GRANTED.  Count III of the Counterclaim is DISMISSED with prejudice.

2)  Defendant Biotronik, Inc.'s Motion for Summary Judgment [DE-116] is GRANTED

in part and DENIED in part:

> a) Defendant's Motion for Summary Judgment is GRANTED in part and

DENIED in part as to Count I of the Second Amended Complaint:

      I) Summary judgment is GRANTED to the extent Count I is based on the

      OEM program.

      ii) Summary judgment is DENIED to the extent Count I is based on the

      deletion of certain accounts from the Representatives' territory.

b)  Defendant's Motion for Summary Judgment as to Count II of the Second

Amended Complaint is GRANTED.   The Agreements are for a term of years and

are not terminable at-will.

c)  Defendant's Motion for Summary Judgment as to Counts III and IV of the

Second Amended Complaint is DENIED.

DONE and ORDERED in Miami, Florida, this **29** day of September, 2014.

                          PATRICIA A. SEITZ
                          UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record